Curtis Wayne SHAVERS, Jr., Appellant,

v.

The STATE of Texas, Appellee.

No. 09–97–182 CR

Court of Appeals of Texas, Beaumont.

Submitted Dec. 17, 1998.

Decided Feb. 3, 1999.

Discretionary Review Refused May 12, 1999.

Steven M. Hollis, Jasper, for appellant.

Guy James Gray, Criminal Dist. Atty., Jasper, for state.

Before WALKER, C.J., and BURGESS and STOVER, JJ.

## OPINION

EARL B. STOVER, Justice.

A jury found appellant Curtis Wayne Shavers, Jr., guilty of the murder of Nicole Brown and assessed his punishment at eighty years confinement in the Texas Department of Criminal Justice—Institutional Division.

On appeal, Shavers raises six points of error. In point of error one, he contends the trial court committed error by allowing the jury to consider evidence illegally seized in a warrantless search of his home. Prior to trial, Shavers filed a motion to suppress all items of physical evidence, which he claimed were obtained in violation of Chapter 18 of the Texas Code of Criminal Procedure and Article 1, Section 9 of the Texas Constitution. The trial court denied the motion to suppress. We do not have the record of the testimony in the motion to suppress hearing before us.

As we appreciate the substance of point of error one, appellant is not complaining of the trial judge's pre-trial ruling on appellant's motion to suppress; Shavers is, instead, complaining of the judge's decision during trial to admit into evidence the items from the warrantless search. We construe appellant's trial objections to be Fourth Amendment complaints, which we understand his brief on appeal to urge as well. Although appellant also raises TEX.CODE CRIM. PROC. ANN. art. 38.23(a) on appeal, we have not found an objection on that ground below. We address only those claims briefed on appeal and preserved at the trial court level.[1]

■ The standard of review for admission or exclusion of evidence is abuse of discretion. *See Erdman v. State,* 861 S.W.2d 890, 893 (Tex.Crim.App.1993). We review the trial court's decisions on admissibility of evidence in that light.

In October 1996 Nicole Brown (Nicole) and her friend Angie Johnson (Angie) were resid-

---

1. Appellant does not articulate separate arguments under the Texas Constitution. Consequently, we do not address them. *See Colburn v.* *State,* 966 S.W.2d 511, 517 n. 5 (Tex.Crim.App. 1998); *Riddle v. State,* 888 S.W.2d 1, 7–8 (Tex. Crim.App.1994).

ing in a trailer in Jasper, Texas. Angie testified that Shavers, Nicole, and their son Dylan were already living there together when she (Angie) moved in with them. According to Angie, although Shavers and Nicole owned the trailer, Shavers had not been there the two weeks before Nicole was killed.

Prior to October 25, 1996, the date of the murder, there had been trouble between Shavers and Nicole. Three witnesses—Angie, Latisha Spurlock (a neighbor), and Joe Bates (Nicole's friend)—testified that a few weeks before Nicole's death, an angry Shavers had thrown a coffee table across a room in the trailer when Nicole was there with Bates. Angie was present during the incident and called the police. She further testified that Shavers called Nicole and harassed her on the phone many times a day and that arguments were common between them. According to Bates, Shavers was aware of a sexual relationship between Bates and Nicole. On another occasion, Shavers followed Nicole and Angie down the road and cut them off with his vehicle; another argument followed.

On October 24, 1996, Angie and Nicole had gone to Bates' house. Bates testified that when Shavers unexpectedly appeared at the house that night, Nicole went outside to talk to Shavers. Angie testified that during the argument which followed, Shavers told Nicole he would burn the trailer down, a comment which Bates likewise confirmed during his testimony at trial. Bates also testified Shavers "yelled out of his truck as he [Shavers] was driving off that night that if he couldn't have her, nobody could."

According to Angie, she and Nicole stayed at Bates' house until approximately 2 a.m. on October 25. After arriving back at the trailer and going to bed, Angie was awakened by Nicole's screams. Shavers was inside the trailer, and Nicole was telling him he could not keep barging in on them. Even when the door was locked, Shavers would kick it, causing it to come unlocked and open, so that he could gain entrance to the trailer. To Angie, "[i]t just looked like they were arguing and pushing each other." As Angie went to the phone to call 9-1-1, Nicole ran out of the bedroom. "[S]he fell right there at the

bedroom door. And he was on top of her, stabbing her." According to Angie, his arm went up and down several times in a stabbing motion. After Angie completed the 9-1-1 call, Shavers advanced towards her, and she ran to the home of a neighbor, Latisha Spurlock. While there, Angie saw Shavers as he walked out the door of the trailer. "It looked like he was wiping a pocket knife off." Latisha also saw Shavers running from the trailer. After Shavers left, Angie and Latisha went to the trailer to check on Nicole's condition and retrieve Dylan, the child. They found Nicole lying on her stomach on the floor. Angie testified she kept telling Nicole to breathe, and "she gasped for air, maybe twice."

Responding to the 9-1-1 call, the police arrived on the scene. Officer LaFleur, the first to arrive, testified it was an emergency call. He immediately entered the trailer and saw Nicole Brown on the floor with blood all around her. LaFleur testified he scanned the area looking for suspects, as well as the two other people (the child and Angie) he knew were living there at the time. Like LaFleur, Officers Ford and Frame responded to the report of a victim being stabbed at that residence. It was also their opinion that this was an emergency—a life and death situation.

Officer Ford testified Shavers appeared at the scene in a pickup truck driven by his father even before Nicole had been taken away in the ambulance. Ford observed Shavers climbing into the back of the ambulance with the victim. From there Shavers was removed and arrested. After appellant was placed under arrest and *Mirandized,* and after the victim had been removed from the scene, the officers began "processing the residence."

The evidence from the scene of the crime, which was obtained without benefit of a search warrant, included the following:

(1) the video tape of the crime scene made on October 25, 1996, at 10:50 a.m.;

(2) a photograph of a knife with a broken blade found in the master bedroom;

(3) photographs of the area where the body was found;

(4) a photograph of a knife found in Shavers' truck;

(5) a paper sack from McDonalds;

(6) a telephone book;

(7) photographs taken from various vantage points in the trailer;

(8) appellant's wallet;

(9) a photograph of appellant at the scene; and

(10) a photograph of appellant's wallet.

Appellant objected to the admission of this evidence at trial because it was obtained in a warrantless search.

 Although the Fourth Amendment to the United States Constitution generally prohibits warrantless searches, both the United States Supreme Court and the Texas Court of Criminal Appeals have recognized that in limited situations an immediate search without a warrant is reasonable. *See Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *Colburn v. State*, 966 S.W.2d 511, 519 (Tex.Crim.App. 1998); *Brimage v. State*, 918 S.W.2d 466, 500 (Tex.Crim.App.1994). This exception, known as the Emergency Doctrine, or the Exigent Circumstances Doctrine, allows an immediate, warrantless search where a police officer has reasonable cause to believe that, if the search were delayed to obtain a warrant, serious bodily harm or death might result. *Colburn*, 966 S.W.2d at 519. Similarly, when the police come upon the scene of a homicide, they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises and may seize any evidence that is in plain view during the course of their legitimate emergency activities. *Mincey*, 437 U.S. at 392–93, 98 S.Ct. 2408. Taking into account the facts and circumstances known to the police at the time of the search of the trailer, we apply an objective standard of reasonableness in determining whether a warrantless search is justified. *Brimage*, 918 S.W.2d at 501.

 In the instant case, the officers responded to a 9–1–1 call of a stabbing. Clearly, the situation was an emergency one, giving them the right under *Mincey* to enter the trailer to check on the victim, search for the actor and any other victims, and seize evidence in plain view. Unlike the exhaustive search in *Mincey*, which went on over a four day span, the search herein was completed the same day. In *Mincey*, drawers, closets, and cupboards were opened and their contents were inspected, carpets were ripped up, bullet fragments were dug out of the walls and floors, and 200 to 300 objects were seized. *Mincey*, 437 U.S. at 389, 98 S.Ct. 2408. Here the record reveals the officers' entry into the trailer was justified by an emergency situation during which they searched the trailer for other victims and the actor and seized those items in plain view. Under that scenario, we conclude the Emergency Doctrine applies, and the warrantless search of the trailer was justified. The trial judge did not abuse his discretion in admitting the evidence obtained therefrom. Point of error one is overruled.

In addition to filing a motion to suppress the evidence seized in the warrantless search of the trailer, appellant also filed a motion to suppress the evidence obtained under an evidentiary search warrant. The trial court denied this motion to suppress as well. In point of error two, appellant contends the trial court erred in allowing the admission into evidence, over his objection, the blood and other samples (along with the corresponding laboratory test results) obtained from appellant under this allegedly defective "evidentiary" search warrant. On appeal, Shavers claims the search warrant affidavit "does not establish probable cause 'that the specifically described property or items that are to be searched for or seized constitute evidence of that offense or evidence that a particular person committed that offense.'" *See* TEX. Code CRIM. PROC. ANN. art. 18.01(c) (Vernon Supp.1999).[2]

The probable cause affidavit supporting the search warrant relates the officer had a sworn statement from Angie Johnson, in which she stated she saw Shavers repeatedly stab the victim. In the affidavit, the officer also states that, after receiving the 9–1–1

---

**2.** The citation to the version in effect at the time of the offense is as follows: Act of May 27, 1995, 74th Leg., R.S., ch. 670, § 1, 1995 Tex. Gen. Laws 3642.

call, officers entered the trailer where Angie Johnson had witnessed the stabbing and found Nicole Brown lying in a pool of blood. The affidavit further states that even before the victim was taken by ambulance to the hospital, appellant returned to the crime scene; his clothes appeared to have fresh blood stains on them. The officer further related in the affidavit that a kitchen knife with blood stains on it was in the bed of appellant's pickup truck at the murder scene.

Appellant does not dispute the accuracy of the statements contained in the probable cause affidavit. As we appreciate his complaint on appeal, he contends the facts alleged therein are not sufficient to establish probable cause. Whether the facts alleged in a probable cause affidavit sufficiently support a search warrant is determined by examining the totality of the circumstances. *Ramos v. State*, 934 S.W.2d 358, 362–63 (Tex.Crim.App.1996) (citing *Illinois v. Gates*, 462 U.S. 213, 228–229, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)); *Borsari v. State*, 919 S.W.2d 913, 917–18 (Tex.App.— Houston [14th Dist.] 1996, pet. ref'd).

An affidavit in support of an evidentiary search warrant must set forth sufficient facts to establish probable cause that: (1) a specific offense has been committed; (2) the specifically described property or items to be searched for constitute evidence of the offense or evidence that a particular person committed the offense; and (3) the property or items to be searched for or seized are located at the place to be searched. TEX.CODE CRIM. PROC. ANN. art. 18.01(c) (Vernon Supp.1996)[.] The task of the magistrate evaluating the affidavit is to make a practical, common-sense decision whether, given the totality of the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *See also Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332–33, 76 L.Ed.2d 527 (1983) (articulating the "totality of the circumstances" standard). In making this determination, the magistrate is not bound by standards such as proof beyond a reasonable doubt or preponderance of the evidence. The magistrate's sole concern is probability. Although the magistrate is bound by the four corners of the document, he may nonetheless make reasonable inferences from the facts and circumstances contained in the affidavit. *Borsari*, 919 S.W.2d at 917–18, (footnote omitted) (some citations omitted).

Based on the information contained in the affidavit, we conclude there was probable cause for issuance of the evidentiary search warrant. Unquestionably, given the circumstances detailed in the affidavit and the eyewitness's statement, the blood samples from appellant's clothing, his own blood samples, and other evidence from his person would be evidence of the offense charged. We conclude the nature of the evidence sought to be seized, along with the surrounding circumstances, satisfies the various probable cause requirements for evidentiary search warrants outlined in Article 18.01(c). Point of error two is overruled.

In point of error three, Shavers contends the trial court erred in allowing into evidence, over his objection, testimony regarding extraneous offenses in the guilt/innocence phase of the trial.[3] Appellant alludes to testimony by "several witnesses as to extraneous acts." However, he only directs us to the testimony of two—specifically Angie Johnson's testimony regarding bruises she observed on the victim in the past, and Officer LaFleur's testimony regarding previous complaints at the residence. Although appellant objected to the specific testimony by these two witnesses, the same evidence came in, without objection, elsewhere. In particular, Bates testified, without objection, to marks and bruises on Nicole's neck which he noticed a week or ten days before her death. As to testimony regarding previous complaints at the residence, Angie Johnson testified she was present at the table-throwing incident; Latisha Spurlock, the neighbor, verified that Angie came over to her house on that occasion and asked her to call the

---

**3.** Although appellant makes a reference to an allegedly improper jury instruction in point of error three, his basic complaint, as we understand it, concerns the trial court's admission of extraneous offenses. Accordingly, we have addressed this point in that fashion.

police. This was the same complaint that Officer LaFleur and Bates testified to at trial. When the same evidence is presented elsewhere without objection, no reversible error exists. *Leday v. State,* 983 S.W.2d 713, 717–18 (Tex.Crim.App.1998); *Ryan v. State,* 937 S.W.2d 93, 102 (Tex.App.—Beaumont 1996, pet. ref'd). We overrule point of error three.

■ In point of error four, Shavers complains the trial court erred in allowing improper hearsay testimony to be admitted into evidence over his objection. He points first to Angie Johnson's testimony that Shavers stated he was going to burn the trailer down. However, like the evidence complained of in point of error three, this evidence likewise came in elsewhere without objection. Therefore, no reversible error exists regarding its admission.

■ Shavers also contends in point of error four that a portion of Officer Frame's testimony contained hearsay. According to Frame, Shavers stated, while in the ambulance with Nicole, that he (Shavers) did not mean to hurt her. According to the officer, Shavers was crying, upset, and disturbed. We conclude Officer Frame's testimony concerning the statement was admissible under TEX.R.CRIM. EVID. 801(e)(2), which provides in pertinent part as follows:

> (e) **Statements which are not hearsay.** A statement is not hearsay if:
>
> . . . .
>
> (2) *Admission by party-opponent.* The statement is offered against a party and is (A) his own statement in either his individual or representative capacity. . . .

Rule 801(e)(2) is explained in *Bell v. State,* 877 S.W.2d 21, 24 (Tex.App.—Dallas 1994, pet. ref'd).

> This rule, which *exempts* admissions by a party opponent from the hearsay definition, recognizes that admissions differ from hearsay exceptions. When dealing with admissions, the concern is no longer with reliability and trustworthiness of the statement. Rather, admissions are admitted on a notion that a party should not be allowed to exclude his own statement on the

ground that what he said was untrustworthy.

*Id.* (footnote omitted). Because the statement was admissible as an admission by a party opponent, the trial judge did not err in admitting it into evidence. Point of error four is overruled.

■ In point of error five, Shavers contends the trial court erred in allowing Ticia Shavers, appellant's former wife, to testify for the State over his objection, since her name did not appear on the State's witness list. According to Shavers, the witness list was ordered produced in response to appellant's motion for discovery, production, and inspection of evidence. Initially, we note that we do not find such a motion in the record before us. Similarly, we do not find the State's witness list in the record, although the State attached the list to its brief on appeal. Like the State, appellant appended to his brief a document not found in the record on appeal—specifically a copy of a letter from the district attorney's office to trial counsel. The State also attached a copy of the same letter to its brief, along with the witness list. Since both parties are in agreement as to the contents of the letter, and given the unique facts surrounding this point, we consider the information contained within it in our review. It is within our discretion to accept an uncontested statement of fact as true. *See Hunter v. State,* 954 S.W.2d 767, 769 (Tex.Crim.App.1995); *Spaulding v. State,* 896 S.W.2d 587, 588 (Tex.App.—Houston [1st Dist.] 1995, no pet.).

According to both Shavers and the State, the letter from the district attorney's office stated that the State was enclosing a copy of its witness list. Both are also in agreement that the letter informed Shavers of three other people, including Ticia Roberts, whose names were not on the witness list. The addresses of the three were also given in the letter. We agree the information in the letter, as explained in their briefs on appeal, is not a model of clarity. However, as we appreciate the parties' factual detailing of the letter's contents, the State's purpose in the letter was to give appellant the State's list of witnesses, along with the names of three additional witnesses not already on the

State's witness list. The contents clearly set out the name and address of Ms. Shavers.

In addition, the trial judge admitted into evidence State's Exhibit 70, another letter from the district attorney's office to appellant's trial attorney, in which the State specifically stated that it intended "to use any extraneous offenses and events listed in the enclosed written statements of Ticia Shavers, Angie Johnson, Joe Bates[.]"[4] Based on State's Exhibit 70 and on the facts as stated in both briefs, we conclude appellant had notice of the State's intention to use Ticia Shavers' testimony at trial and was not surprised or prejudiced by the inclusion of it. Consequently, the trial court did not abuse its discretion in allowing her testimony at the punishment phase of the trial. Point of error five is overruled.

In point of error six, Shavers contends there was error in the jury charge, which contained an inaccurate statement regarding the effect of good conduct time on parole eligibility. Pursuant to Tex.Code Crim. Proc. Ann. art. 37.07 § 4(a) (Vernon Supp. 1999), the trial court had a duty to charge the jury as set out, in part, below:

Sec. 4. (a) In the penalty phase of the trial of a felony case in which the punishment is to be assessed by the jury rather than the court, if the offense of which the jury has found the defendant guilty is listed in Section 3g(a)(1), Article 42.12, of this code ..., unless the defendant has been convicted of a capital felony the court *shall* charge the jury in writing as follows:

"Under the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

"It is also possible that the length of time for which the defendant will be imprisoned might be reduced by the award of parole.

"Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less, *without consideration of any good conduct time he may earn*. If the defendant is sentenced to a term of less than four years, he must serve at least two years before he is eligible for parole. Eligibility for parole does not guarantee that parole will be granted."

(emphasis added)

Because the trial court had a statutory duty to so instruct the jury and because appellant did not object to the error at trial, we consider the charge error under the egregious harm standard set forth in *Almanza v. State,* 686 S.W.2d 157, 171 (Tex. Crim.App.1984) (op. on reh'g). We must decide whether the error was so egregious and created such harm that the accused did not have a fair and impartial trial. *Id.* In making this determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Id.; Guillory v. State,* 956 S.W.2d 135 (Tex. App.—Beaumont 1997, no pet.).

In the instant case, the applicable portions on which the jury was charged at the punishment stage are set out below:

Under the law applicable in this case, the Defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

**4.** This letter is contained in the record before us.

. . . .

Under the law applicable in this case, if the Defendant is sentenced to a term of imprisonment, he will not become eligible for parole *until the actual time served plus any good conduct time earned equals one-half of the sentence imposed or 30 years, whichever is less.* Eligibility for parole does not guarantee that parole will be granted.

(emphasis added) As appellant contends and the State concedes, that portion of the charge making eligibility for parole contingent upon the "actual time served plus any good conduct time earned" is incorrect.

The misstatement of law in the charge, in effect, tells the jury that the defendant may be eligible for parole at an earlier date because of good conduct time. One possible result of such an instruction is a jury's assessment of a longer sentence in an attempt to offset the effect of good conduct time. In addition to the offending instruction, however, the charge also contains other instructions which have been regarded by this court and others as curative and mitigating factors to consider when determining whether the erroneous instruction caused harm to a defendant. *See Guillory,* 956 S.W.2d at 137; *Love v. State,* 909 S.W.2d 930, 935 (Tex. App.—El Paso 1995, pet. ref'd); *Roberts v. State,* 849 S.W.2d 407, 410 (Tex.App.—Fort Worth 1993, pet. ref'd). The other instructions, which we consider to have a mitigating effect, are as follows:

Eligibility for parole does not guarantee that parole will be granted.

It cannot accurately be predicted how the parole law and good conduct time might be applied to this Defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular Defendant. You are not to consider the manner in which the parole law may be applied to this particular Defendant.

It is presumed the jury followed the trial judge's curative instructions regarding the manner in which the parole law may be applied to an accused. *Guillory,* 956 S.W.2d at 137; *Love,* 909 S.W.2d at 935. Absent indications to the contrary, this presumption prevails. *Id.*

Other factors in this case also mitigate against the finding of "egregious" harm required by *Almanza.* There is no evidence the jury was confused about the instructions in the charge. No motion for new trial was filed, and nothing in the record suggests the jury discussed, considered, or tried to apply good conduct time or the parole law in assessing punishment. The record also reveals there were no comments at any point in the trial by either the State or appellant's counsel concerning parole, parole eligibility, good conduct time, or any effect good conduct time might have on eligibility for parole. In addition, the evidence presented at trial also belies any indication of egregious harm. Angie Johnson testified she saw Shavers stab Nicole Brown multiple times. The neighbor, Latisha Spurlock, stated she saw Shavers leaving the trailer on the morning in question right before she and Angie Johnson went there and found Nicole lying in a pool of blood caused by multiple stab wounds. There was DNA evidence indicating the blood on appellant's clothing was that of Nicole. Angie Johnson, Joe Bates, and law enforcement officers testified concerning previous arguments between Shavers and the victim the defendant. A final mitigating factor is the jury's assessment of punishment at less than the maximum allowed under the law—eighty years rather than ninety-nine years or life.

Based on the entire jury charge and certain mitigating instructions contained therein, the state of the evidence, and the argument of counsel, we conclude the error in the jury charge was not egregious. It did not create such harm that the accused did not have a fair and impartial trial. Point of error six is overruled.

The judgment of the trial court is affirmed.

AFFIRMED.