Antonio Rico TORREZ, Appellant,

v.

The STATE of Texas, Appellee.

No. 14–99–00955–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

Oct. 12, 2000.
Rehearing Overruled Dec. 21, 2000.

Clay S. Conrad, Houston, for appellants.

Alan Curry, Houston, for appellees.

Panel consists of Chief Justice MURPHY and Justices HUDSON and WITTIG.

## MAJORITY OPINION

WITTIG, Justice.

More than a dozen Harris County deputies descended on Antonio Rico Torrez's home in a raid reminiscent of vigilantes. With emergency lights flashing, weapons drawn, they entered Torrez's yard and house without a warrant. The state argues today for us to extend the exigent circumstances or emergency doctrine. We, however, find unreasonable this intrusive police search at appellant's brother's wake. Accordingly, we decline to further stretch exigent circumstances rules at the expense of the constitutional fabric that protects individual liberty.

Antonio Rico Torrez, appeals a judgment of the 182nd District Court finding him guilty of possession of a controlled substance. He complains the trial court improperly denied his motion to suppress contraband evidence, discovered on a closet shelf, following a warrantless entry and search of his home. We reverse and remand.

Appellant held a wake at his home on December 30, 1998. It was attended by approximately 15–20 people, and included music by a mariachi band. The party occurred outside two mobile homes, within a fenced yard, in East Harris County. The state's evidence is found in a single affidavit by one of the deputies. In this affidavit, it is reported that the Harris County Sheriff's office received several telephone complaints of Hispanic males "partying, drinking, and discharging fire arms into the air." The state does not contend, nor are there facts in the record, indicating any type of violent crime or other emergency was taking place.

According to the affidavits of several other witnesses, approximately a dozen or more officers arrived after midnight. Weapons drawn, the officers approached the locked gate protecting the entrance to the property and ordered the appellant to unlock the gate. He complied. Once unlocked, without requesting permission, the officers entered the yard. The deputy's affidavit countered that the officers noticed beer containers and numerous shotgun shells on the party grounds. The officers observed no blood or other signs of violence. They saw a male exit the eastern-most mobile home, and upon seeing the officers, try to re-enter. The officers ordered him to stop and remain outside, while several lawmen entered the residence. Multiple affidavits reveal that the officers that remained outside ordered the partygoers to get on their knees with their hands up. The officers failed to mention either the mariachi band, or the fact they ordered the revelers to their knees, hands behind their heads.

The search crew eventually entered one of the bedrooms, and found a clear plastic baggie containing a small amount of white powder on a shelf in a bedroom closet. Subsequent testing found the baggie to contain 8.8 grams of cocaine. Appellant, the owner of the home, was charged with Possession of a Controlled Substance.

### The Standard of Review

There was no live testimony at the suppression hearing. Rather, the evidence was submitted solely by affidavit. The state nevertheless contends that the trial court made a credibility determination upon the truth of the state's affidavit. It further argues that we should give deference to that choice by the trial court. We disagree. Although we afford almost total deference to a trial court's rulings on "mixed questions of law and fact" where the resolution of the question turns on an evaluation of a witnesses' credibility and demeanor, *see Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997), we nonetheless may review de novo "mixed questions of law and fact" where the resolution of the question does not turn on an evaluation of a witnesses' credibility and demeanor. *See id.; see also Loserth v. State*, 963 S.W.2d 770, 772 (Tex.Crim.App. 1998). Because there were no live witnesses, the trial judge was in no better position than this court to determine the legality of the search. *See Wynn v. State* 996 S.W.2d 324, 327 (Tex.App.1999, no pet.) (holding the appellate court is in just as good a position as the trial court to test mixed questions of law and fact in testing the sufficiency of affidavits); *see also Lane v. State*, 971 S.W.2d 748, 752 (Tex.App.— Dallas 1998, pet. ref'd.) (holding that a trial courts determination based upon an affidavit did not hinge on credibility and demeanor). Therefore, we review de novo.

### Warrantless Searches

Both the Fourth Amendment of the United States Constitution and Article I, Section 9 of the Texas Constitution forbid unreasonable searches and seizures. *See Brimage v. State*, 918 S.W.2d 466, 500 (Tex.Crim.App.1996); *see also Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). This concept is so fundamental that the law imposes a duty to exclude evidence seized in such illegal invasions, both to discourage lawless police conduct, and because courts may not en-

dorse lawless invasions of citizens' constitutional rights by permitting the government unhindered use of the fruits of such invasions. *See Terry v. Ohio,* 392 U.S. 1, 12–13, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Further, Texas may once have afforded greater constitutional protections on its citizens than the minimum standards required by the federal constitution. *See Heitman v. State,* 815 S.W.2d 681, 683–84, 690 (Tex.Crim.App.1991). Unlike the federal Bill of Rights, which was added to the U.S. Constitution years after its ratification, the Texas Bill of Rights is the first article in its constitution and it has held this position in each of Texas' five state constitutions. *Id.* at 690. Such placement indicates the degree of importance of these provisions to the drafters of the Texas Constitution and the citizens of this state. *Id.*

■ More recently, we have been informed that the Texas Constitution, in certain non-home searches, may even afford less constitutional protections where the defendant waives or fails to expressly invoke his federal constitutional rights. *See Hulit v. State,* 982 S.W.2d 431, 433–36 (Tex.Crim.App.1998) (holding that officer did not need a warrant when he received an ambulance assist call of a possible heart attack in a vehicle at a specific location, and police actually witnessed an individual slumped over a steering wheel at the specific location).[1] In the instant case, however, the contested search was conducted in the defendants trailer home without any attendant medical, fire or other emergency. Both the United States and Texas courts recognize that citizens have a greater right of protection in their homes. *See McNairy v. State,* 835 S.W.2d 101, 106 n. 5 (Tex.Crim.App.1991); *see generally Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (noting that people normally have an actual and subjective expectation of privacy in their residence, and society is prepared to recognize this expectation as objectively reasonable). Further, unlike the defendant in *Hulit,* Torrez repeatedly invoked his rights under both the Texas and United States Constitutions.

■ Warrantless searches are unreasonable per se unless they fall under one of a few specific exceptions. *See Reasor v. State,* 12 S.W.3d 813, 817 (Tex.Crim.App. 2000); *Brimage v. State,* 918 S.W.2d 466, 500 (Tex.Crim.App.1996); *see also Mincey v. Arizona,* 437 U.S. 385, 390, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). Three exceptions to this rule include instances where: 1) the defendant voluntarily consented to the search. *See Reasor,* 12 S.W.3d at 818; 2) certain exigent circumstances justify a warrantless search. *See Colburn v. State,*

---

1. It is difficult to conceive that the police should not be allowed to respond to this type exigent medical emergency without a warrant, so long as it is for the purpose of responding to the emergency itself. Federal constitutional standards would have justified warrantless immediate action to preserve life or avoid serious injury. *See Mincey, supra.* However, the court went on to unnecessarily separate the protections of the Texas Constitution from the United States Constitution. It is inherently inconsistent with constitutional law and federalism to suggest the law of the several states may offer less protections than the supreme law of the land, the United States Constitution. Judge Keller correctly observes that certain rights may be waived and that the Texas Constitution may be interpreted differently than the United States Constitution. *See Hulit, supra.* It is, however, legally and logically impossible for a state to suffer its citizens less than the minimum guarantees of the U.S. Constitution. This misapprehension is pointed out in the concurring opinion of Judge Price in that the U.S. Constitution sets the floor for individual rights. *Id.* at 441. The unnecessary departure from precedent by the court's majority opens the door to a plethora of ineffective counsel allegations; any defense lawyer who does not now object on the basis of both the United States and Texas Constitutions surely is ineffective as a matter of law. It would be jurisprudentially wise if all of our Texas courts would reiterate the most fundamental and conservative tenet of our law, *stare decisis. See Dickerson v. United States,* 530 U.S. 428, —— – ——, 120 S.Ct. 2326, 2335–2336, 147 L.Ed.2d 405 (2000) (doctrine of *stare decisis* carries such persuasive force that courts have always required a departure from precedent to be supported by some special justification).

966 S.W.2d 511, 519 (Tex.Crim.App.1998); *Brimage*, 918 S.W.2d at 500–01; and 3) the state performs a protective sweep incident to arrest. *See Reasor*, 12 S.W.3d at 816–17; *see also Maryland v. Buie*, 494 U.S. 325, 336, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990).

## I.  Consent

The state does not contend appellant consented to the search and there is no evidence in the record of consent. Therefore we need not address this exception.

## II.  Exigent Circumstances

■ The Texas Court of Criminal Appeals recognizes two exigent circumstances where an immediate search without a warrant is permissible: 1) where there is a threat to someone's health or safety, *See Colburn*, 966 S.W.2d at 519; *Mincey*, 437 U.S. at 392, 98 S.Ct. 2408 (no warrant necessary when police action is to protect or preserve life); and 2) where police reasonably conclude that evidence would be destroyed before they could obtain a search warrant. *See McNairy v. State*, 835 S.W.2d 101, 107 (Tex.Crim.App.1991).

The state does not contend the police feared Torrez would destroy any evidence and there is no evidence in the record suggesting the destruction of evidence. Thus, we will focus on the first exigent exception.

### Threat to health or safety

■ The emergency doctrine allows an immediate warrantless search where a police offfcer has reasonable cause to believe that, if the search were delayed to obtain a warrant, serious bodily harm or death might result. *See Colburn*, 966 S.W.2d at 519; *Brimage*, 918 S.W.2d at 500–01; *Shavers v. State* 985 S.W.2d 284, 288 (Tex. App.—Beaumont 1999, pet. ref'd).

■ We apply an objective standard of reasonableness in determining whether a warrantless search is justified. *See Colburn*, 966 S.W.2d at 519. In evaluating the officers' reasonableness we take into account the facts and circumstances known to the police at the time the search. *Id.*

### Surrounding Facts and Circumstances.

We first note that the State of Florida recently argued in favor of a "firearm exception," allowing an officer to stop and frisk a person, based solely on an anonymous tip that the subject was carrying a gun. *See Florida v. J.L.*, 529 U.S. 266, 120 S.Ct. 1375, 1377, 146 L.Ed.2d 254 (2000). In a unanimous opinion, the Supreme Court rejected the argument, holding that such circumstances, without more, were insufficient under the Fourth Amendment. *See id.* at 1376–78; U.S. Const. amend. IV. Although firearms are dangerous, and extraordinary dangers sometimes justify unusual precautions, an axiomatic firearms exception would "enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting target's unlawful carriage of gun." *Id.* at 1380. The state's single affidavit does not identify the caller(s).

■ Likewise, Texas requires the state to show more than the simple assertions of an anonymous caller to overcome an individual's constitutional protections. *See Shavers*, 985 S.W.2d at 287–88 (warrantless search of a trailer justified where police had received a 911 call from a witness who knew the defendant and witnessed him stabbing the victim); *Brimage*, 918 S.W.2d at 501–03 (holding a search was reasonable where: 1) officer learned the appellant had previously committed sexual assault; 2) the defendant's uncle informed police of evidence indicating a "violent struggle" in the master bedroom; and 3) the officer earlier discovered bloody scissors and a jagged piece of bloodstained blouse in the defendant's suitcase). In these cases, the officer had some reasonable grounds for believing that there was an actual, specific victim involved who was in danger of death or serious bodily

injury. However, in our case, the officer's affidavit did not provide any facts indicating why the officers believed any actual or hypothetical victim was in danger of death or serious injury. Indeed, the record indicates that the officers had actual notice, through the dispatch call they responded to, that the guns were fired in the air, not aimed at anything living. The officer's affidavit indicates that dispatch had clearly communicated that the complained of activities were "partying, drinking, and discharging firearms into the air." The record does not identify the caller(s) nor allege that the caller gave any facts to suggest any danger to life or limb. Accordingly, such a call does not, standing alone, present sufficient facts or circumstances for a reasonable officer to conduct a warrantless search of an individual's home.[2]

■ Nevertheless, additional facts and circumstances, along with the apparently anonymous phone call, might still justify a warrantless search. The record indicates that the following facts and circumstances were known to the officers at the time of the search in determining whether the officer's actions were reasonable. The state argues and the dissent echoes the additional factors of empty beer cans, bottles and spent cartridges littering the lawn. Both the state and dissent, however, fail to apply the objective standard of reasonableness. See Brimage, 918 S.W.2d at 501. This requires us to look at the circumstances known to the deputies at the time of the search. See Garcia, 827 S.W.2d 937, 941 n. 5 (Tex.Crim.App.1992). The record reveals the existence or absence of the following circumstances:

1. This was a party scene. The mariachies were playing. While it may not have been apparent this was a wake, we cannot cast a closed eye to the fact that this band played on

during these supposedly dire circumstances.

2. The officers had actual notice, via the complaint, that the guns were fired in the air; conspicuously absent was any claim that the shots were directed at anyone.

3. The revelers' lack of concern about the purported gunfire.

4. The record does not reflect the officers saw that anyone was intoxicated.

5. The record does not reflect that there were any signs that a victim was anywhere on the premises or anyone needing assistance.

6. There simply is no evidence the house harbored *any person*, much less one posing a danger to police or others.

■ Warrantless searches are unreasonable, per se, unless they fall under one of the few above-discussed exceptions. See Reasor, 12 S.W.3d at 817. Even under the doctrine of exigent circumstances, the state still has the burden of showing that the warrantless intrusion was justified. See Bray v. State, 597 S.W.2d 763, 765 (Tex.Crim.App.1980); Pine v. State, 889 S.W.2d 625, 631 (Tex.App.—Houston [14th Dist.], 1994, pet. ref'd). To show this the state must present facts and circumstances, known to the officer at the time of the search, that would reasonably cause the officer to believe that delaying the search to obtain a warrant might result in serious bodily harm or death.

On this night before New Years Eve, the deputies were called by dispatch to respond to "partying, drinking, and discharging fire arms into the air." The single affidavit presented by the state offers no additional evidence to show the officers had reason to believe this was anything beyond what the call portrayed—at most a

---

2. The affidavit of Ricardo Trejo recounts one of the officer's views of warrantless searches of a house. "Tony asked the police if they had a warrant of any kind, and I heard one of the officers tell him that the phone call they received was their warrant." Trejo also stated that about half of the officers "walked straight into Tony's house."

disturbance of the peace at a party. The presence of empty beer containers and the spent cartridges the officers observed (obviously the remnants of the shots already reported to have been fired in the air), along with the partygoers, mariachi band, and complete absence of any sign of anyone in actual or potential peril, does not yield the conclusion that there were exigent circumstances that would justify the officers' massive intrusion into appellant's private residence.

### III. Protective sweep incident to arrest

The state also contends that the officers were entitled to have entered the home as part of a protective sweep. A protective sweep is not an automatic right the police possess when making an in-home arrest. *See Reasor*, 12 S.W.3d at 816. A protective sweep is a quick and limited search of premises, incident to arrest and conducted to protect the safety of police officers or others. *Id.* at 815; *see also Maryland v. Buie*, 494 U.S. 325, 328, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990).

### Incident to Arrest

Although the record is noticeably silent as to any actual arrest—aside from the appellant based upon the fruits of the contested search—the state nonetheless contends that the officers had grounds to arrest people at the residence at time they entered the Torrez residence. Specifically they cite article 14.03(a)(1) of the Texas Code of Criminal Procedure, which allows officers to arrest without a warrant:

> persons found in suspicious places and under circumstances which reasonably show that such persons have been guilty of some felony, violation of Title 9, Chapter 42, Penal Code, breach of the

peace, or offense under Section 49.02, Penal Code, or threaten, or are about to commit some offense against the laws.

TEX.CODE CRIM.PROC.ANN. art. 14.03(a)(1).

Title 9, Chapter 42 of the Texas Penal Code proscribes several misdemeanor offenses for the discharge of firearms under certain circumstances.[3] However, article 14.03(a)(1) still requires the presence of probable cause as imposed by Article I, Section 9 of the Texas Constitution. *See State v. Parson*, 988 S.W.2d 264 (Tex. App.—San Antonio 1998, no pet.) (holding the state must show probable cause in arresting the defendant to utilize article 14.03(a)(1)); *see also Amores v. State*, 816 S.W.2d 407, 413 (Tex.Crim.App.1991) (holding that article 14.03(a)(1) requires the legal equivalent of constitutional probable cause). Texas' concern for safeguarding citizens from rash and unreasonable police conduct compels us to require more than a "mere suspicion" to create probable cause. *See Guzman v. State*, 955 S.W.2d 85, 87 (Tex.Crim.App.1997).

For probable cause to exist, an officer must have reasonable and trustworthy knowledge of facts and circumstances, which would be sufficient in themselves, to warrant a reasonably cautious man that a particular individual has either committed or is committing an offence. *See Amores*, 816 S.W.2d at 413. In the instant case, the officer's affidavit fails to state facts supporting probable cause to suspect any particular individual in appellant's home committed an offense so as to justify their intrusion into his home and make a custodial arrest, as well as a search incident to the arrest. In any event, no actual arrest was made until after the seizure. *See* TEX CODE.CRIM.PROC., art. 15.22 (Vernon 1977).

---

**3.** *See* TEX.PEN.CODE ANN. § 42.01(a)(9) (Vernon 1994) (stating "[a] person commits [a Class B misdemeanor] if he intentionally or knowingly ... discharges a firearm in a public place other than a public road or a sport shooting range ..." ); *see also* TEX.PEN.CODE ANN. § 42.12(a)(b) (Vernon 1994) (stating "[a] person commits [a Class A misdemeanor] if the person recklessly discharges a firearm inside the corporate limits of a municipality having a population of 100,000 or more"). (The record only reveals the incident occurred in East Harris County, but not within such a municipality.)

**18** ■

### Reasonable Belief of Danger to Self or Others.

■ In addition, a police officer may only conduct a protective sweep of a residence where he possesses an objectively reasonable belief, based on specific and articulable facts, that a person in the area poses a danger to that police officer or to other people in the area. *See Reasor*, 12 S.W.3d at 816–17. Here, the complained-of activity of "shooting into the air" had occurred earlier outside, not in the house. Although a person exiting one of the dwellings, turned around to re-enter, the state's affidavit concedes that the officers successfully detained appellant before re-entry. The state offered no evidence of what the officers expected to find in the house. Other than a conclusory statement, the affidavit for the state fails to produce additional objective facts or circumstances to indicate that there was another individual inside the dwelling, much less that such an individual was armed and dangerous.

### As to the Dissent.

Oswald Chambers, the noted and revered Protestant preacher, remarked: "Never discard a conviction."[4] The dissent seems adamantly set upon preserving another type of conviction.

■ While citing *Reasor*, its several salient holdings are ignored. "The Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the search officer possess a *reasonable belief* based on *specific and articulable facts* that the area to be swept *harbors an individual* posing a danger to those in the arrest scene." *Id.* at 816 (citing *Buie*, 494 U.S. at 337, 110 S.Ct. 1093) (emphasis added). There was no arrest and no harbored villain. "The

sweep must not be a 'full search of the premises.' Rather, it may only extend 'to a cursory inspection of those spaces where a person may be found' and may only last long enough to 'dispel the reasonable suspicion of danger.'" *Id.* (citing *Buie*, 494 U.S. at 335, 110 S.Ct. 1093). Here, drawers were opened, furniture moved, the kitchen cupboards were opened and searched, under and between the mattresses searched, and the top of closet shelves search by a group of at least six deputies. Can cupboards, drawers, mattresses and closet tops be considered cursory?

Contrary to the protective sweep argument, the facts reveal that the officers approached appellant's gate "so we could investigate." They immediately entered appellant's home. According to unimpeached evidence, no warrant was necessary for this entry into appellant's home because "the phone call they received was their warrant."

■ Finally, while the dissent's statistics[5] reveal some of the treacherous duty daily performed diligently by remarkable men and women in uniform, the ultimate responsibility of the these police and deputies is to uphold the rule of law. One of the shined foundations of the rule of law is its abhorrence of the warrantless search of a home. When neither life nor limb of the police are endangered, their foremost duty to protect liberty must persist. Even in the face of real or objectively perceived threat, the police response must always be rational, dispassionate and measured. The goal of police work is not the invasion but the protection of liberty. The dissent paints a dire and foreboding picture, not unlike a murder scene. The United States Supreme Court recently repeated, *per curiam*, there is no such "murder scene ex-

---

4. OSWALD CHAMBERS, MY UTMOST FOR HIS HIGHEST 198 (1963).

5. While these figures are nowhere to be found in the record, the Brandeis brief is nothing new to appellate practice. Perhaps these police statistics are evoked by the stark but

accurate description of this midnight mariachi raid. Still one must wonder, if it is truly necessary to spray black musket powder over the entire bilge lest one mouse escape the saw pit jaws of the law. (Adapted from Herman Melville.)

ception" to the Fourth and Fourteenth Amendments. *See Flippo v.. West Virginia,* 528 U.S. 11, 120 S.Ct. 7, 145 L.Ed.2d 16 (1999). The court reiterated a warrantless entry could be made if the police reasonable believed a person was in immediate need of aid, for other victims, or for a killer on the premises. But a warrantless search of an apartment is not constitutionally permissible simply because a homicide had recently occurred there. *Id.* at 8. Implicit in the requirement for an objectively reasonable police response, is the necessity to discern between a gun fight or violent crime and a spirited wake.

We hold the state has failed to meet its burden of showing the existence of any lawful basis to have entered appellant's home without a warrant. Appellant's issue is sustained.

We reverse and remand the judgment of the trial court.

HUDSON, Justice, dissenting.

I take exception with the majority's characterization of the police conduct in this case as "reminiscent of vigilantes." To the contrary, the police pursued the only prudent course which would at once stabilize a potentially dangerous situation and guarantee the safety of both police officers and civilians. Because the exigent circumstances under which the investigation proceeded justified a protective sweep of appellant's home, I respectfully dissent.

Law enforcement is a dangerous profession. According to statistics gathered by the Federal Bureau of Investigation, over fifty-nine thousand police officers were assaulted in the United States in 1998.[1] Sixty-one of these officers died of their injuries. *See id.* The most hazardous assaults, of course, are those made with firearms. Of the 682 police officers killed in the line of duty from 1989 through 1998, ninety-two percent died from gunshot wounds.[2] Moreover, the most likely time of day for an officer to be slain is between 8:01 p.m. and 2:00 a.m. *See id.* at 5.

Here, the record shows that shortly after midnight on December 30, 1998, police were dispatched to appellant's home to investigate numerous reports of men "partying, drinking, and discharging firearms into the air." The gunfire was audible one mile away from the residence. Eight to twelve officers converged upon appellant's residence where they encountered up to twenty men standing outside two mobile homes. The ground was littered with beer cans and bottles and approximately 100 spent shotgun shells and rifle cartridges. As police entered appellant's yard, they observed one of the revelers exit a mobile home. Upon seeing the police, he turned and tried to reenter the residence. Police detained the man and immediately entered the home to check for armed suspects.

As they entered the mobile home, the police instantly observed a holster and assorted ammunition on the kitchen counters and in the living room. One of the lower cabinet doors was standing open and four boxes of rifle ammunition, two boxes of pistol ammunition, and a rack of shotgun shells were visible. Proceeding through the home, police discovered a Colt AR15 rifle and a Mossberg pistol grip shotgun— both barrels were hot to the touch. In a bedroom closet, police observed a plastic bag containing the cocaine at issue here.

The Supreme Court has recognized that "in dealing with the rapidly unfolding and often dangerous situations on city streets the police are in need of an escalating set of flexible responses, graduated in relation to the amount of information they possess." *See Terry v. Ohio,* 392 U.S. 1, 9–10, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

1. Federal Bureau of Investigation, *Forward* to LAW ENFORCEMENT OFFICERS KILLED AND ASSAULTED 1998 (supplement to UNIFORM CRIME REPORTS (1998)).

2. Federal Bureau of Investigation, LAW ENFORCEMENT OFFICERS KILLED AND ASSAULTED 1998, at 4.

When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm. *Id.* at 24, 88 S.Ct. 1868. As a logical extension of the *Terry* doctrine, it is now well established that a police officer may, to ensure his safety, search all areas from which an attack could immediately be launched against him so long as he possesses articulable facts that would warrant a reasonably prudent officer in believing the area to be swept harbors an individual posing a danger to him. *See Maryland v. Buie*, 494 U.S. 325, 334, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990).

Here, the police had good reason to be wary. They were dispatched, late at night, to investigate a disruption involving the frequently lethal combination of firearms and alcohol. Despite a show of force by the police, they still found themselves outnumbered two to one. The lawn litter provided instant confirmation that guns had been repeatedly discharged and much alcohol had been consumed. The police could not know, of course, whether any of the revelers had outstanding warrants, criminal records, violent dispositions, a hatred for law enforcement officers, or weapons on their persons. The police were further discomforted by the appearance of a man exiting one of the mobile homes

who, upon seeing the police, tried to immediately reenter the home for an unknown purpose. The man's intentions could have been innocent, but he could also have been attempting to retrieve a weapon or alert other persons of the police presence.[3]

In the face of these circumstances, the police pursued the only *reasonable* course of action. They quickly stabilized the situation by conducting a protective sweep through the mobile homes and ordering all those present to assume a non-threatening posture against a fence until the precise nature of the disturbance could be further determined. While a "protective sweep" is normally incident to an arrest made inside a home, I believe the unusual facts of this case justified the temporary intrusion. Both the United States Supreme Court and the Texas Court of Criminal Appeals have recognized that, in limited situations, an immediate search without a warrant is reasonable. *See Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *Colburn v. State*, 966 S.W.2d 511, 519 (Tex.Crim.App.1998); *Brimage v. State*, 918 S.W.2d 466, 500 (Tex.Crim.App. 1994).[4]

The majority asks too much of police officers when it insists they should have conducted their investigation in a potentially lethal fire zone that could be swept by one or more armed individuals from inside the mobile homes.[5] Accordingly, I respectfully dissent.

---

**3.** In 1998, twenty-six percent of the fatal assaults upon police officers occurred while the police were investigating disturbances. *See* Federal Bureau of Investigation, LAW ENFORCEMENT OFFICERS KILLED AND ASSAULTED 1998, at 29. Ambushes accounted for another sixteen percent of the fatal assaults upon police officers. *See id.* Here, the police were investigating a disturbance involving firearms where the circumstances rendered them extremely vulnerable to an ambush.

**4.** This exception, known as the Emergency Doctrine, or the Exigent Circumstances Doc-

trine, allows an immediate, warrantless search where a police officer has reasonable cause to believe that, if the search were delayed to obtain a warrant, serious bodily harm or death might result. *See Colburn,* 966 S.W.2d at 519. "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Mincey,* 437 U.S. at 392, 98 S.Ct. at 2413.

**5.** The motion to suppress was decided upon opposing affidavits as authorized by TEX.CODE CRIM.PROC.ANN. art. 28.01, § 1(6) (Vernon

1989).  The State submitted the affidavit of Harris County Sheriff's Deputy Joseph Quinn. When describing the circumstances surrounding the discovery of cocaine, Deputy Quinn simply states: "On the shelf in the bedroom closet I observed a clear plastic baggie containing a clear plastic baggie [sic?] containing a white powdery substance believed to be cocaine."

A "protective sweep" is not a full search of the premises.  *See Reasor v. State,* 12 S.W.3d 813, 816 (Tex.Crim.App.2000).  "It extends only to those spaces where a person may be found and may last only so long as necessary to dispel the reasonable suspicion of danger."

*Id.* Certainly, a closet is a place where a person might hide.  The affidavit does not state whether the cocaine was in plain view on the closet shelf or was discovered after a more intrusive search.  However, appellant's motion to suppress complains only of the entry into the home, not the particular areas searched therein.  Moreover, none of the affidavits offered in support of appellant's motion make any reference to the cocaine, the closet, or the shelf on which it was discovered. Thus, there is nothing in the record to suggest the cocaine was hidden or concealed from view once the closet door was opened.