**In The**
*Court of Appeals*
*Ninth District of Texas at Beaumont*
**NO. 09-19-00416-CR**

**HERBERT WAYNE COLLINS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 252nd District Court**
**Jefferson County, Texas**
**Trial Cause No. 18-30649**

**MEMORANDUM OPINION**

A jury convicted Herbert Wayne Collins for the murder of Bradison Mims by shooting him with a firearm. *See* Tex. Penal Code Ann. § 19.02(b)(1). After Collins pled true to multiple enhancements, the jury found him to be a habitual offender and sentenced him to life imprisonment in the Institutional Division of the Texas Department of Criminal Justice. *See id.* § 12.32 (prescribing punishment for first degree felony), § 12.42 (prescribing punishment for habitual offenders), § 19.02(c) (classifying murder as a first-degree felony). In his first two issues, Collins contends

1

the trial court violated his constitutional rights to due process and due course of law by failing to ensure the jurors were qualified, and in his third issue, he contends the court's punishment charge contained an improper parole instruction. Having reviewed the record in its entirety, we will affirm the trial court's judgment.

## Background

The following recitation of facts is gleaned from the witnesses' testimony and other evidence admitted during trial. At approximately 2:30 p.m. on October 16, 2018, Mims and his girlfriend, C.C.,[1] drove to an apartment complex in Beaumont, Texas known as "The Bricks." Mims, a known drug dealer, stopped there to sell drugs. Prior to arriving at The Bricks, Mims learned one of his friends, "K Deuce," had been in an altercation with Collins.[2] C.C. said when she and Mims drove up to the apartment complex, they observed Collins running around and behaving erratically. C.C. believed Collins was under the influence of drugs.

After Mims completed a sale, they drove to the convenience store nearby. C.C. testified she and Mims did not exit the vehicle when they arrived at the store because Mims noticed Collins going into the same store. Instead, they returned to

---

[1] To protect the privacy of this eyewitness, who the defendant allegedly threatened following the shooting, we identify her by using initials. *See* Tex. Const. art. I, § 30(a) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

[2] "K Deuce" also went by the street name "K2."]

2

the apartment complex, where they remained in the car. Collins walked by their car and Mims asked Collins about his earlier confrontation with K Deuce. C.C. indicated neither Mims nor Collins appeared to be angry during this discussion. Collins walked away to an apartment in the rear of the complex.

According to C.C., Collins returned a short time later with a long gun and pointed it through the passenger window, across her, and at Mims.[3] Collins insulted Mims, who responded by asking Collins why he was "tripping" and tried to tell him he was "messing up." C.C. said Collins put the gun down, agreed with Mims, and said he had been going through a difficult time. C.C. explained that shortly after Collins put the weapon down, Mims angrily exited the vehicle because he felt Collins had disrespected him. Mims ripped off his shirt, displaying that he wanted to fight.

Another vehicle pulled up on the other side of the street with several people inside. "Pop" exited this vehicle and attempted to defuse the situation between Collins and Mims, telling them to let it go. C.C. said that Collins got into the vehicle with Pop, then Collins returned a short time later with another firearm and began shooting at Mims. C.C. said when the shooting began, Mims first tried to get back in the car but then "took off running." Mims fell to the ground, begging Collins not

---

[3] C.C. described it as a "[b]ig black gun with a scope[]" and likened it to "a military rifle."

to kill him, but Collins appeared to shoot Mims in the head. C.C. explained that as Collins was shooting Mims, "[Collins] just looked like he wasn't there, like he was zoned out. He had no remorse." Collins then pointed the gun at C.C., told her to leave, and warned her not to say anything.

B.R.,[4] another eyewitness who lived at The Bricks, also observed the shooting, and reluctantly testified at trial. B.R. indicated she feared for her life and was afraid someone would hurt her for testifying. B.R. testified she saw Collins shoot Mims multiple times, then hop in a car and leave. B.R. also testified that before Collins left, he stuck the gun in the girl's face, and B.R. was afraid he was going to shoot the girl. B.R. testified that the weapon used to kill Mims was driven away in an identified vehicle.

B.R. called 9-1-1 and reported the shooting, which the State played for the jury. In the recording, she told the operator, "a guy by the name of Herb C just killed somebody . . . with a big ol' gun" and that "he's leaving in a blue car."[5] B.R. also told the operator that Collins shot the victim multiple times.

Collins told officers in his recorded statement that "Pop" gave him a ride to his girlfriend's house after the shooting. According to Collins, he got into a fight

<hr>

[4] To protect the privacy of this eyewitness, who felt threatened following the shooting, we identify her by using initials. *See* Tex. Const. art. I, § 30(a) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

[5] The record indicated Collins used the nickname "Herb C."

with "K2," and he ran to the convenient store up the street because K2 left to get a long gun. He denied killing Mims and told police they had "the wrong guy." Collins behaved erratically on the video while giving his statement. One of the interviewing detectives testified that he believed Collins was under the influence of some drug.

Despite his denials, two eyewitnesses identified Collins as the shooter and described him shooting Mims while Mims was on the ground begging for his life. Additionally, officers recovered twenty-one shell casings at the scene, all the same caliber and brand. The firearms analyst opined that twenty of these casings were fired from the same weapon, and while the remaining casing had similar characteristics, there was not enough to say conclusively it was fired from the same gun or to exclude it. The only weapon provided to the firearms analyst did not match the caliber of bullets recovered at the scene. Detectives testified they never located an AK-47 weapon, the weapon typically associated with the caliber of bullets used.

When police arrested Collins the evening of the shooting, they performed a gunshot residue (GSR) test. The analyst testified it was positive for GSR. The forensic pathologist, Dr. Ami Murphy, testified Mims sustained twelve gunshot wounds. She explained that several shots to his head and neck could have been fatal individually, but in this case, some combination of them was responsible for death. Dr. Murphy opined that "[t]he cause of death was penetrating and perforating gunshot wounds of the head, neck, torso and extremities."

5

**Issues One and Two: Juror Qualifications**

In his first two issues, Collins contends the trial court failed to ensure the jury panel was qualified during voir dire, violating his due process and due course of law rights. During voir dire, the trial court advised the jury:

> So, what I'm going to do is go through what those qualifications are. As I'm doing that, if you think that any of those qualifications may affect your ability to serve, keep that in mind, and at the end of the process, I'm going to ask you, by a raise of hand, if there's something you need to let us know either with regard to these qualifications or with regard to anything that has been discussed during the process this afternoon. So, just kind of keep it in mind, and let us know at the appropriate time.
>
> The first qualification is you must be 18 years of age or older. You must live in Jefferson County, Texas. We do not expect this week - - this week - - this case to last longer than a week. So, we need you to live here for this week. If you moved recently out of Jefferson County, we need to know that. If you are displaced because of the Tropical Storm Imelda but your primary residence is still here and you're living somewhere else while you're fixing your house, that's fine as long as your primary address is still in Jefferson County, Texas. You must be of sound mind and good moral character. You must be able to read and write the English language. If you have served as a juror in the preceding six months - - not this process but you were actually selected and served as a juror in a case within six months from now, depending on the length of time you were on that jury, you may get a pass for this week. So, just let us know that at the appropriate time if that applies to you. Also, you must not have been convicted of a felony or a theft of any level, and you cannot be under legal accusation or indictment for a theft or felony of any level.
>
> . . .
>
> And, again, at the end of this, I will go back and ask if there's anyone who has any of those issues we talked about.

After the parties completed their portion of voir dire, the trial court queried:

> So, is there anyone who I did not call for any reason that has information that they feel like they need to give us or wants to come back in for any other reason?

In response, one juror came forward to privately tell the trial court English was not her first language, she did not feel comfortable, and might have difficulty understanding. The trial court and parties agreed the juror was disqualified, and the trial court dismissed her. After the parties exercised their strikes and the trial court read the jurors' names, but prior to swearing them in, the trial court asked if the parties had objections to the jurors seated. Collins responded, "No, Your Honor."

> Specifically, Collins complains that

> the trial court never asked the prospective jurors about their qualifications after approximately sixty pages of voir dire by the parties, and the prospective jurors would not have remembered the various qualifications without the trial court restating them at the end of voir dire even if the judge had asked about their qualifications.

Collins concedes in his brief that he did not to object to the trial court's failure to qualify the panel yet argues this was "structural error" not requiring objection. *See* Tex. R. App. P. 33.1(a). We disagree.

"The failure to make a timely objection waives the right to challenge the jury's qualifications." *Collum v. State*, 96 S.W.3d 361, 366 (Tex. App.—Austin 2002, no pet.) (citing *Mayo v. State*, 4 S.W.3d 9, 12 (Tex. Crim. App. 1999)). Government Code section 62.102 prescribes jurors' qualifications. *See* Tex. Gov't Code Ann. §

7

62.102. A juror may be stricken for cause for certain enumerated reasons. *See* Tex. Code Crim. Proc. Ann. art. 35.16. Texas Code of Criminal Procedure article 35.19 provides that "[n]o juror shall be impaneled when it appears that he is subject to the second, third or fourth cause of challenge in Article 35.16, though both parties may consent." *Id.* art. 35.19 (listing absolute disqualifications from service as conviction of misdemeanor theft or felony, being under indictment or other legal accusation for misdemeanor theft or felony or being insane).

As the Court of Criminal Appeals explained, "even if an absolutely disqualified juror sits on a criminal jury, reversal of the conviction is permitted only if the defendant timely objected at trial or shows significant harm on appeal." *Mayo*, 4 S.W.3d at 12. Collins has done neither. Likewise, statutory authority expressly addresses this. Texas Code of Criminal Procedure article 44.46, provides that

> A conviction in a criminal case may be reversed on appeal on the ground that a juror in the case was absolutely disqualified from service under Article 35.19 of this code only if:
> (1) the defendant raises the disqualification before the verdict is entered; or
> (2) the disqualification was not discovered or brought to the attention of the trial court until after the verdict was entered and the defendant makes a showing of significant harm by the service of the disqualified juror.

Tex. Code Crim. Proc. Ann. art. 44.46.

The trial court specifically asked whether the State or Collins had objections to the jury, and both indicated they did not. Collins does not argue nor is there any

8

indication in the record that a disqualified juror sat on the jury. Rather, he complains that the trial court did not properly qualify the panel and focuses on the use of "shall" in Texas Code of Criminal Procedure Articles 35.10 and 35.21. *See* Tex. Code Crim. Proc. arts. 35.10, 35.21. Even if we agreed that the trial court failed to properly qualify the jury, which we do not, a statute's use of mandatory language does not automatically abolish the need to preserve error. *See Mayo*, 4 S.W.3d at 12.

With respect to Collins's argument that the trial court's failure to properly qualify the jury violated his due process and due course of law rights, fundamental error exists only where an "'appellant can show he was denied a trial by a fair and impartial jury.'" *Jones v. State*, 982 S.W.2d 386, 391 (Tex. Crim. App. 1998); *Collum*, 96 S.W.3d at 366. "[T]he constitutional right to trial by an impartial jury is not violated by every error in the selection of a jury." *Jones*, 982 S.W.2d at 391. Here, Collins "was required to object prior to the impaneling and swearing of the jury[]" to preserve his complaint that the trial court failed to properly qualify the jury or make a showing of significant harm. *See Collum*, 96 S.W.3d at 366 (citation omitted); *see also* Tex. Code of Crim. Proc. Ann. art. 44.46.

Because Collins failed to object or show harm, we overrule issues one and two.

## Issue Three: Punishment Charge

In his third issue, Collins argues the trial court erroneously instructed the jury regarding good conduct time. The punishment charge provided as follows:

Under the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

It is also possible that the length of time for which the defendant will be imprisoned might be reduced by the award of parole.

Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served plus any good conduct time earned equals one-half of the sentence imposed or thirty (30) years, whichever is less. Eligibility for parole does not guarantee that parole will be granted.

It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

Collins specifically complains that the charge advised the jury he would be eligible for parole when his actual time served plus his good conduct time equaled one-half his sentence. Collins did not object to the charge, but the State concedes

this language in the charge was erroneous since the law required the charge to instruct Collins would be parole eligible when his actual time served alone equaled one-half his sentence. *See* Tex. Code Crim. Proc. Ann. art. 37.07 § 4(a) (noting proper instruction to be given if an offense is listed in 42A.054(a), listing murder).[6, 7]

When, as here, a defendant fails to object to the court's charge or states he has no objection to it, we will not reverse for jury-charge error unless the record shows

---

[6] We cite to the current statutes, as any amendments do not impact the outcome of this appeal.

[7] The proper instruction is as follows:

The length of time for which a defendant is imprisoned may be reduced by the award of parole.

Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, the defendant will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less. If the defendant is sentenced to a term of less than four years, the defendant must serve at least two years before the defendant is eligible for parole. Eligibility for parole does not guarantee that parole will be granted.

It cannot accurately be predicted how the parole law might be applied to this defendant if sentenced to a term of imprisonment, because the application of that law will depend on decisions made by parole authorities.

You may consider the existence of the parole law. You are not to consider the manner in which the parole law may be applied to this particular defendant.

Tex. Code Crim. Proc. Ann. art. 37.07 § 4(a).

11

"egregious harm" to the defendant. *Ngo v. State*, 175 S.W.3d 738, 743-44 (Tex. Crim. App. 2005); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). Pursuant to *Almanza's* egregious harm standard, the record must show a defendant suffered actual, rather than merely theoretical, harm from the charge error. *Almanza*, 686 S.W.2d at 174. "Errors that result in egregious harm are those that affect 'the very basis of the case,' 'deprive the defendant of a valuable right,' or 'vitally affect a defensive theory.'" *Ngo*, 175 S.W.3d at 750 (quoting *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996)).

Since the State conceded error in the charge, we address whether the error constituted egregious harm. In our analysis, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171; *Shavers v. State*, 985 S.W.2d 284, 291 (Tex. App.—Beaumont 1999, pet. ref'd). Factors courts consider when assessing egregious harm in the context of an erroneous parole instruction include: (1) the presumption the jury followed any mitigating instruction; (2) whether a jury note existed regarding parole or good-conduct time; (3) the State's emphasis of the possibility of parole in argument; and (4) the severity of the defendant's sentence. *See Hooper v. State*, 255 S.W.3d 262, 271-72 (Tex. App.—Waco 2008, pet. ref'd); *see also Igo v. State*, 210

12

S.W.3d 645, 647-48 (Tex. Crim. App. 2006) (discussing various factors mitigating against finding of egregious harm when appellant received maximum sentence).

Although the jury sentenced Collins to the maximum punishment, several factors mitigate against a finding of egregious harm. *See Igo*, 210 S.W.3d at 647. First, the charge contained a curative instruction admonishing the jury that it could not consider the extent to which good conduct time could be awarded or forfeited by this particular defendant. *See id.* We have explained that absent indications to the contrary, the presumption the jury followed the trial court's curative instruction prevails. *See Shavers*, 985 S.W.2d at 292. Here, there are no indications the jury did not follow this instruction. Further, the record does not indicate the jury sent any notes or had any communications regarding the applicability of good conduct time or parole. *See id.* We decline Collins's invitation to speculate that the jury's question about the difference between a 99-year sentence and life constituted such an inquiry, especially considering the other factors. The State did not mention good conduct or the possibility of parole in its argument. *See id.*; *see also Igo*, 210 S.W.3d at 647. Finally, the evidence relating to punishment was exceptionally strong. *See Igo*, 210 S.W.3d 647-48. Collins pled "true" to the enhancements involving multiple prior felony convictions. Collins testified that despite having "skills" he looked for the "quick dollar" and had been selling drugs his whole life. The evidence established that officers recovered twenty casings fired from the same weapon, with twelve

13

rounds hitting the victim. Two eyewitnesses testified that Mims was on the ground pleading for his life when Collins shot him in the head. One eyewitness testified that Collins threatened her after the shooting and warned her not to say anything, while the other told jurors she did not want to testify and was afraid for her life.

Having determined the erroneous instruction did not result in egregious harm, we overrule this issue.

## Conclusion

We conclude (1) Collins failed to timely object to the trial court's purported failure to properly qualify the jury or failed to show that the jury as constituted denied him to a fair and impartial trial, and (2) the erroneous good conduct language in the court's charge did not result in egregious harm. Accordingly, we affirm the trial court's judgment.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on December 1, 2020
Opinion Delivered November 3, 2021
Do Not Publish

Before Kreger, Horton and Johnson, JJ.

14