

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00081-CR

_____

JOSEPH WEAVER, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 462nd District Court
Denton County, Texas
Trial Court No. F21-1227-462

---

Before Sudderth, C.J.; Kerr, J.; and Lee Gabriel (Senior Justice, Retired,
Sitting by Assignment)
Memorandum Opinion by Justice Gabriel

## MEMORANDUM OPINION

Appellant Joseph Weaver appeals from his convictions for one count of indecency with a child by contact and three counts of sexual assault of a child and from his cumulative sentence of forty years' confinement in the Institutional Division of the Texas Department of Criminal Justice. *See* Tex. Penal Code Ann. §§ 12.32–.33, 21.11(a)(1), 22.011(a). In his first of four issues, Weaver contends that the jury charge on punishment was erroneous. In his second and third issues, he argues that the evidence was insufficient to support his convictions in count one and count three of the indictment. In his fourth issue, Weaver argues that the trial court's decision to cumulate his sentences violated his right to have the jury assess his punishment and that the trial court's cumulated sentences are grossly disproportionate to the sentences assessed by the jury. We affirm.

## I. BACKGROUND

Weaver and Lisa[1] met on the first day of their senior year in high school after Weaver moved with his family to North Texas from Houston. Weaver and Lisa began dating, and Lisa became pregnant. When Weaver's family decided to move away from the area, he made the decision to move with them. Lisa gave birth to Kelsey when she lived with her mother, and due to all the circumstances, Kelsey

---

[1]To protect the victim's identity, we refer to her and her family members (other than Weaver) by fictitious names. *See* Tex. R. App. P. 9.8 cmt. 9.10; Tex. App. (Fort Worth) Loc. R. 7.

2

formed an extremely close bond to her grandparents.[2] Kelsey considers them to be a second set of parents, and she refers to them as Monnie and Dae.

When Kelsey was approximately five years old, Weaver and Lisa reconnected, and he moved back to the Dallas area. Soon thereafter, he and Lisa moved in together and ultimately married. After they married, one more daughter—Amber— and two sons were born to Lisa and Weaver. The family lived in a house that they had purchased on Chestnut Street in Little Elm, Texas. Despite the reunification of Kelsey's parents, she still spent most weekends with Monnie or Dae.

Kelsey described how, when she was about twelve, she became increasingly uncomfortable around Weaver due to his comments and actions towards her. She testified at trial that the first time she remembered something inappropriate actually occurring was after one of her softball games. When she and Weaver returned to the Chestnut Street house, she mentioned that she felt sore from the game. Weaver told her that he would give her a back rub, which he had done before. However, this time, he instructed her to remove her shirt and to lie down on the couch. She testified that she felt uncomfortable with his instruction and instead went to her room.

---

[2]Lisa's parents lived separately when Kelsey was born, but they remained close and Kelsey spent time with each at their homes.

Kelsey described multiple instances of inappropriate touching that she characterized as "gradual" that made her uncomfortable.[3] She testified that when she was sitting at a desk playing a computer video game, Weaver came into the room to watch her play, and as they chatted, he started rubbing her back. She detailed how he "slowly worked his way down towards [her] breasts" with his hands over her clothes and began "massaging." She testified that on this occasion, she did not know why he stopped.[4]

Kelsey also testified that Weaver touched her genitals and penetrated her sexual organ on multiple occasions. One such act that she described occurred when she was playing a video game on a large sectional couch in the living room of the home. Kelsey explained that Lisa was in the kitchen preparing dinner and had her back to the living area while cooking at the stove. Kelsey described the couch as deep and explained how Weaver came over the back of the couch to sit behind her with his legs on either side of her. Kelsey said that she was wearing athletic shorts and a t-shirt but was not wearing underwear. She recounted how Weaver had reached around to put

[3]At the conclusion of the State's evidence, defense counsel requested that the State elect the act upon which it were relying for conviction on each count. The State identified the four acts as follows: count one—the offense that occurred in the computer room when Weaver massaged Kelsey's breasts over her clothes; count two—the offense in the computer room when Weaver penetrated her sexual organ; count three—the offense that occurred in Kelsey's bedroom when Weaver penetrated her sexual organ; and count 4—the last offense that occurred in Kelsey's bedroom when Weaver penetrated Kelsey's sexual organ.

[4]These are the facts alleged to support count one.

4

his hand under her shorts and had massaged her genitals.  She said that his hands stayed on the outside of her vagina "that time."  She also testified that Weaver had stopped and had "quickly withdr[awn]" his hand when Lisa said that dinner was ready. Kelsey then related additional instances when Weaver had touched her genitals or had penetrated her sexual organ.  She described an occasion in the computer room that was similar in how he had massaged her genitals but was memorable because her mother was not home when it began.  She related that when she and Weaver had heard Lisa come in the house, he pulled his hand away.  She explained that his hand was near her genitals, and when specifically asked, Kelsey stated that she believed his hand had been on the inside of her vagina.[5]

When asked how many times Weaver had followed the pattern of giving a massage to touching her vagina to penetrating her vagina, Kelsey answered, "At least five, but I believe more."  She described another repetition of this pattern that had occurred in her bedroom:

[PROSECUTOR]:  What happened first in that time?

[KELSEY]:  It was very similar to the other times.

[PROSECUTOR]:  Okay.  Can you tell me how it started?

[KELSEY]:  With a massage.

[PROSECUTOR]:  Okay.  And then what happened next?

---

[5]These are the facts alleged to support count two.

[KELSEY]: He slowly worked his way down.

[PROSECUTOR]: How far down did he work his way?

[KELSEY]: To my genitals. I believe he placed a finger inside.

[PROSECUTOR]: Inside what?

[KELSEY]: Inside my vagina.[6]

Kelsey testified about the last time that Weaver had committed an offense against her, stating that it had occurred in 2015 in her bedroom in the home on Chestnut Street. She described the layout of her bedroom as containing a loft bed with a desk beneath it. She stated that she was playing a video game at that desk when Weaver came into her room and pulled a stool diagonally behind her. Weaver began by massaging her shoulders and worked his way down to massaging her breasts under her clothes. He then began rubbing the outside of her vagina before inserting his hand inside her vagina and rubbing for "what felt like forever." Kelsey related that at one point, she had pulled his hand away and had made a "mmm" sound to try to stop him; although he stopped for a brief time, he then continued. She explained how she then had frozen because "[i]t was the first time that [it] really just hit [her] as what it was."[7]

---

[6]These are the facts alleged to support count three.

[7]These are the facts alleged to support count four.

Kelsey testified that after this last occurrence of sexual abuse, she avoided Weaver and told Dae that she was "uncomfortable" living at her home and wanted to leave. Although she shared no details of why she was "uncomfortable," Kelsey moved out of the Chestnut Street house in 2015 and never lived with Weaver again. Lisa was informed of Kelsey's disclosure to Dae, and Lisa confronted Weaver. Weaver acknowledged giving massages to Kelsey and moved out of the home. Kelsey continued to live primarily with one of her grandparents.

Kelsey never shared the details of Weaver's sexual abuse of her with her family. She testified that she did not talk about the sexual offenses against her because she was scared. Kelsey finally reported the offenses to the police in 2020. She testified that the timing of her report was due to the fact that she was out of her depressive state and was at a good place in her life and due, in small part, to the fact that Lisa had filed for divorce from Weaver. Kelsey testified that she had three younger siblings who could be subjected to access to Weaver, without their mother present, and that this caused her concern.

Kelsey testified that she kept a journal from 2013 to 2015 chronicling many events during those years. The journal included passages describing her dislike of Weaver and how she feared him and what he would do if she reported him. Kelsey also created a chart specifying certain occurrences of sexual abuse that she added to contemporaneously. She testified that she did not include every instance of sexual

abuse because she did not want to think about it. Kelsey further explained that she quit noting instances of sexual abuse on the chart in 2013 because she had given up.

Weaver was charged in a single indictment with one count of indecency with a child by contact and three counts of sexual assault of a child. A jury convicted him on all four counts and affirmatively answered special issues statutorily enhancing his sexual-assault convictions from second-degree felonies to a first-degree felonies. *See id.* § 22.011(f).

In the punishment phase of the trial, Lisa testified that she had allowed Weaver to return to the marital home in 2018. At that time, Kelsey was still living with one of her grandparents. Lisa explained that after Weaver had moved back in, there was a police investigation concerning Weaver's younger daughter, Amber. The State presented evidence that Weaver had pled guilty on February 20, 2020, to Class A misdemeanor assault of his younger daughter; the offense was a lesser-included offense of a felony indictment. Weaver was placed on community supervision with deferred adjudication. In addition, a protective order was granted that prohibited Weaver from having any contact with Amber for ten years. Lisa testified that the offense against Amber had a profound impact on her; the offense made it impossible for her to talk about what had occurred.[8] Indeed, Amber had to be hospitalized due

---

[8]The State tried to question Amber outside the presence of the jury, but she did not answer questions concerning Weaver's actions that resulted in the charges against him. Amber was not allowed to testify in the presence of the jury.

8

to suicidal ideations. Months later, Lisa applied for and received a protective order for both of her sons. In October 2020, the State filed a motion to proceed with an adjudication of guilt in Weaver's case involving Amber, alleging that Weaver had violated a protective order.

Also in punishment, Kelsey described for the jury the impact that Weaver's offenses had on her. She detailed how she had spent at least three years "in and out of a depressive state" and had contemplated suicide on multiple occasions and how she still suffered from panic attacks when she felt trapped or powerless.

Weaver did not testify in the first phase of the trial, but he did testify at length in the punishment phase. Although the reason for allowing this was not addressed on the record, Weaver was allowed to testify to the jury in a narrative fashion.[9] The State then had an opportunity to ask questions of Weaver. Weaver was asked directly if he had committed each offense for which the jury had found him guilty. Weaver repeatedly answered that he did not recall committing any of the offenses. This line of questioning culminated in his response concerning the charges in count four: "Again, and even more emphatically, I cannot recall that happening." He did

---

[9]Weaver's first attorney filed a motion to withdraw, which was granted. Trial counsel was appointed on March 29, 2021. Trial counsel filed a motion to withdraw on May 19, 2021, which was denied in a hearing after the trial court admonished Weaver concerning self-representation and he stated that he did not want to represent himself. Trial counsel reurged the motion to withdraw immediately before closing arguments in the guilt–innocence phase of the trial. The trial court again denied the motion.

acknowledge that he had pled guilty to misdemeanor assault of Amber, but he denied knowing what he had done that could have resulted in those charges.

The jury assessed his punishment at imprisonment for two years on count one, eight years on count two, ten years on count three, and twenty years on count four. The trial court sentenced him accordingly, ordering that the sentences run consecutively. Weaver brought this appeal.

## II. PUNISHMENT CHARGE

In his first issue, Weaver contends that the trial court provided the jury with a punishment charge that submitted outdated parole instructions because it contained language concerning good-conduct time. Weaver correctly points out that Article 37.07, Section 4(a) of the Code of Criminal Procedure no longer refers to good-conduct time. *See* Act of May 26, 2015, 84th Leg., R.S., ch. 770, § 2.08, 2015 Tex. Gen. Laws 2321, 2366–68 (amended 2019) (current version at Tex. Code Crim. Proc. Ann. art. 37.07, § 4(a)). Instead, the current version of Section 4(a) refers only to parole. *See id.* The effective date of the amendment making this change was September 1, 2019, and the proceedings in this case took place in June 2021.

In reviewing a jury-charge issue, an appellate court's first duty is to determine whether the charge contains error. *Hutch v. State*, 922 S.W.2d 166, 170 (Tex. Crim. App. 1996). The State concedes that including the outdated language concerning good-conduct time is error. Because Weaver was sentenced after the 2019 amendment's effective date, we hold that there was error in instructing the jury

10

regarding parole law using Section 4(a)'s pre-amendment language. *See* Act of May 26, 2015, 84th Leg., R.S., ch. 770, § 2.08, 2015 Tex. Gen. Laws 2321, 2366–68 (amended 2019) (current version at Tex. Code Crim. Proc. Ann. art. 37.07, § 4(a)); *Jones v. State*, No. 10-19-00350-CR, 2021 WL 4198452, at*4 (Tex. App.—Waco Sept. 15, 2021, no pet.) (mem. op., not designated for publication) (holding jury charge on parole was error).

When we find error in the charge, we next consider whether an objection to the charge was made, and we analyze the error for harm. *Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015). Here, Weaver admitted that trial counsel did not timely object to the complained–of language in the punishment charge, so he is entitled to reversal only if he suffered egregious harm as a result of the error. *See* Tex. R. App. P. 33.1. Weaver argues that he was egregiously harmed by this error.

"An egregious harm determination must be based on a finding of actual rather than theoretical harm." *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011). Errors that result in egregious harm are those that affect "the very basis of the case," "deprive the accused of a 'valuable right,'" or "vitally affect [a] defensive theory." *Almanza v. State*, 686 S.W.2d 157, 172 (Tex. Crim. App. 1985). To determine whether harm was egregious, we consider four factors on a case-by-case basis: (1) the jury charge as a whole, (2) the state of the evidence, (3) the parties' arguments, and (4) other relevant information in the record. *Arrington v. State*, 451 S.W.3d 834, 840 (Tex. Crim. App. 2015) (citing *Almanza*, 686 S.W.2d at 171).

11

## A. Examination of Factors

### 1. Entire Jury Charge

The trial court included the following instruction after the erroneous instruction:

> You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good[-]conduct time may be awarded to or forfeited by this particular Defendant. You are not to consider the manner in which the parole law may be applied to this particular Defendant.

We presume the jury followed the trial court's punishment charge. *See Thrift v. State,* 176 S.W.3d 221, 224 (Tex. Crim. App. 2005); *Luquis v. State*, 72 S.W.3d 355, 366 (Tex. Crim. App. 2002). Weaver has not referred us to any evidence in the record to support an argument that the jury did not deliberate and decide his case based on the instructions contained in the charge as a whole.

Weaver argues that the instruction containing good-conduct language was "specifically intended to increase the length of sentences." And he cites us to cases to support his position that the legislature intended for the outdated instruction to do just that. *See, e.g., Arnold v. State*, 786 S.W.2d 295, 300 (Tex. Crim. App. 1990) (stating that the instruction is "clearly designed to increase [the] sentence" (quoting *Gabriel v. State*, 756 S.W.2d 68, 70 (Tex. App.—Houston [1st Dist.] 1988, no pet.) (op. on reh'g)); *Grigsby v. State*, 833 S.W.2d 573, 576 (Tex. App.—Dallas 1992, pet. ref'd) (same). Neither party has the burden to prove harm; however, the record must bear out that Weaver suffered actual harm and not just theoretical harm. *Villareal v. State*,

12

453 S.W.3d 429, 436 (Tex. Crim. App. 2015). While the language complained of might weigh in favor of finding egregious harm and while the additional language cannot cure any harm, taken as a whole, the additional language ameliorated the harm by instructing the jury not to consider the manner in which good-conduct time could affect the sentence or be applied to this particular defendant. *Newman v. State*, 49 S.W.3d 577, 581 (Tex. App.—Beaumont 2001, pet. ref'd) (stating that although the additional instruction does not cure the error, the "'curative' instruction prevents harm to the defendant by warning the jury it cannot consider parole and good conduct in assessing the sentence" (quoting *Rose v. State*, 752 S.W.2d 529, 554 (Tex. Crim. App. 1988), *abrogated in part on other grounds by Karenev v. State*, 281 S.W.3d 428, 434 (Tex. Crim. App. 2009)). The jury did not send any notes inquiring about parole, time credit for good conduct, or their effects on the length of Weaver's imprisonment.[10] Our review of the record reveals no indication that the jury was confused or failed to follow the trial court's instructions, and there is no assertion of or evidence supporting juror misconduct. There is nothing else in the record to even suggest that the jury failed to heed the trial court's admonition against considering how the operation of the parole law could affect Weaver's term of actual imprisonment. *See Murrieta v. State*, 578 S.W.3d 552, 554 (Tex. App.—Texarkana

---

[10]The jury did seek clarification on a different issue by sending a note to the trial court asking whether the punishment for each count would run consecutively or concurrently.

13

2019, no pet.). Considering the jury charge as a whole, this factor weighs against a finding of egregious harm.

## 2. State of the Evidence

Under this prong, we consider the state of the evidence to determine whether the evidence made it more or less likely that the jury charge caused Weaver actual harm. *See Arrington*, 451 S.W.3d at 841. The jury-charge error occurred in the punishment charge and thus could not have affected the guilty verdicts. The jury clearly found Kelsey to be a credible witness when it found Weaver guilty on all counts. The strength of the State's punishment evidence was compelling. Two young girls were victimized by Weaver to a point that they had contemplated suicide and one was incapable of telling what Weaver had done that resulted in a felony indictment and his plea of guilty to assault. Weaver allegedly violated the terms of his community supervision by violating a protective order designed to protect his children.

Weaver was sentenced by the jury to the minimum punishment in the indecency-with-a-child count. The punishment range for the other three counts was confinement for five years to ninety-nine years or life in the Institutional Division of the Texas Department of Criminal Justice. *See* Tex. Penal Code Ann § 12.32. His sentences were assessed by the jury at eight years on count two, ten years on count three, and twenty years on count four. The four sentences assessed by the jury were not extreme given the cumulative evidence when the jury was deliberating punishment. *See Igo v. State*, 210 S.W.3d 645, 647 (Tex. Crim. App. 2006) (stating that

14

although appellant received a maximum sentence, other factors, including the strength of the punishment evidence, mitigated against a finding of egregious harm); *Hooper v. State*, 255 S.W.3d 262, 272 (Tex. App.—Waco 2008, pet. ref'd) (holding that a thirty-year sentence was not severe given the range of punishment up to ninety-nine years or life in prison). Considering the record as a whole, the state of the evidence did not make it more likely that the inclusion of good-conduct language egregiously harmed Weaver. This factor weighs against a finding of egregious harm.

### 3. Parties' Arguments and other Relevant Evidence

Weaver acknowledges that "[t]he good[-]conduct and parole language was not argued by either the State or the Defense." We have not been referred to other relevant evidence on this issue in the record, nor have we found any. These two factors weigh against a finding of egregious harm.

### B. Egregious-Harm Analysis

Weaver argues that this case is analogous to *Navratil v. State*, No. 05-97-01404-CR, 2001 WL 92688, at *3 (Tex. App.—Dallas Feb. 5, 2001, pet. ref'd) (op. on remand, not designated for publication), and *Shamburger v. State*, No. 05-20-00108-CR, 2021 WL 2430903, at *8 (Tex. App.—Dallas June 15, 2021 no pet.) (mem. op., not designated for publication). *Navratil* concerned a parole instruction that the defendant would not "become eligible for parole until the actual time served *plus any good-conduct time* earned equals one-half of the sentence imposed." 2001 WL 92688, at*1. This instruction was in error because the indictment contained a deadly-weapon allegation,

15

which makes parole eligibility available only after the defendant has served one-half of the sentence imposed, without consideration of good-conduct time. *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 4(a). The Dallas Court of Appeals acknowledged that there is a four-prong test to be applied and recognized that the accused in that case pled guilty to intoxication manslaughter with a blood-alcohol level of more than two times the legal limit two hours after the accident, that no mention was made of parole law or good-conduct time during argument by either side, and that there was "'no evidence' the jury was confused by the instruction." *Navratil*, 2001 WL 92688, at *1–4. The court concluded that "[this] is one of those rare instances where erroneous jury instructions *alone* caused egregious harm." *Id.* at *4 (emphasis added). *Shamburger* dealt with the same instruction as in the present case. 2021 WL 2430903, at *7. The Dallas court in *Shamburger* cited *Navratil* as precedent for what it applied as a bright-line rule compelling a conclusion that the defendant was egregiously harmed because there was an "absolute misstatement of the law." *Id.* at *8 (quoting *Navratil*, 2001 WL 92688, at *3)

Following the decision in *Navratil*, the Court of Criminal Appeals addressed the same punishment-charge error that occurred in that case performing an egregious-harm analysis. *Igo,* 210 S.W.3d at 645. The Court of Criminal Appeals applied the egregious-harm standard by weighing the four factors discussed above and found that

16

although there was a misstatement of law, the weight of all the factors mitigated against a finding of egregious harm. *Id.* at 647.[11]

All of the factors in this case weigh against a conclusion of egregious harm. The inclusion in the punishment jury charge of the reference to good-conduct time and its impact on parole did not "affect the very basis of the case" or "vitally affect a defensive theory." *Taylor v. State,* 332 S.W.3d 483, 490 (Tex. Crim. App. 2011) (citing *Almanza*, 668 S.W.2d at 172); *Robinson v. State*, No. 01-16-00565-CR, 2018 WL 454751, at \*4 (Tex. App.—Houston [1st Dist.] Jan. 18, 2018, no pet.) (mem. op, not designated for publication) (holding that erroneous instruction regarding good-conduct time was not egregiously harmful); *see Hooper*, 255 S.W.3d at 272–73 (holding that defendant was not egregiously harmed by erroneous instruction regarding parole eligibility); *Shavers v. State*, 985 S.W.2d 284, 292 (Tex. App.—Beaumont 1999, pet. ref'd) (same). We overrule Weaver's first issue.

### III. SUFFICIENCY OF THE EVIDENCE

In Weaver's second issue, he argues that the evidence is legally insufficient to sustain a verdict of guilty of indecency with a child because the evidence of a specific intent to arouse or gratify the sexual desire of any person amounts to nothing more

---

[11]*Navratil* relied on *Hill v. State,* 30 S.W.3d 505, 508–09 (Tex. App.—Texarkana 2000, no pet.), in which the Texarkana court did not consider the *Almanza* factors but found that the jury was "inaccurately informed and misled by the court's charge," which in and of itself showed egregious harm. 30 S.W.3d at 509. After *Igo*, the Texarkana court explicitly accepted that *Hill* was "abrogated by *Igo*." *See Murrieta*, 578 S.W.3d at 558–59.

than speculation. In his third issue, Weaver challenges the legal sufficiency of the evidence to support the jury's verdict in count three that Weaver committed sexual assault by penetrating Kelsey's sexual organ.

## A. Standard of Review

Federal due process requires that the State prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979); *see* U.S. Const. amend. XIV. The *Jackson* standard of review, which is explained below, is the "only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks v. State*, 323 S.W3d 893, 912 (Tex. Crim. App. 2010) (overruling *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996)). "[W]e review the sufficiency of the evidence establishing the elements of a criminal offense under the single sufficiency standard set out in *Jackson v. Virginia*." *Acosta v. State*, 429 S.W.3d 621, 624 (Tex. Crim. App. 2014).

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017).

This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences

from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021).

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608.

To determine whether the State has met its burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by a hypothetically correct jury charge to the evidence adduced at trial. *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021); *see also Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("The essential elements of an offense are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the

19

State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Hammack*, 622 S.W.3d at 914. The law as authorized by the indictment means the statutory elements of the offense as modified by the charging instrument's allegations. *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021); *see Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

We must scrutinize circumstantial evidence of intent as stringently as other types of evidence. *Laster v. State*, 275 S.W.3d 512, 519–20 (Tex. Crim. App. 2009). When the record supports conflicting inferences, a reviewing court must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution and must defer to that resolution. *Petetan v. State*, 622 S.W.3d 321, 337 (Tex. Crim. App. 2021).

Juries are permitted to draw reasonable inferences from the evidence presented at trial as long as each inference is supported by the evidence presented at trial. *Carter v. State*, 620 S.W.3d 147, 150 (Tex. Crim. App. 2021). For an example of the extent to which jurors may decide ultimate facts based on inferences, see *Hooper v. State*, 214 S.W.3d 9, 15–17 (Tex. Crim. App. 2007) (criticizing intermediate appellate-court cases holding that a jury cannot determine ultimate facts by "inference stacking," stating that a prohibition of "inference stacking" is not part of Texas's criminal

20

jurisprudence, and holding that appellate courts must instead consider, under *Jackson*, whether inferences are reasonable in light of "combined and cumulative force of all the evidence"), and *Sanders v. State*, 119 S.W.3d 818, 820–21 (Tex. Crim. App. 2003). In *Winfrey v. State*, the Court of Criminal Appeals discussed the difference between reasonable inferences and mere speculation, stating that a speculation-driven conclusion cannot support a finding beyond a reasonable doubt. 393 S.W.3d 763, 771 (Tex. Crim. App. 2013); *see also McKay v. State*, 474 S.W.3d 266, 270 (Tex. Crim. App. 2015) (explaining that evidence is insufficient if it "creates only a suspicion that a fact exists"); *Anderson v. State*, 416 S.W.3d 884, 888 (Tex. Crim. App. 2013) ("Speculation is mere theorizing or guessing about the possible meaning of the facts and evidence presented.").

## B. Count One

In his second issue, Weaver argues that there is insufficient evidence that he engaged in sexual contact with Kelsey by touching her breast for the purpose of sexual gratification as alleged in count one of the indictment. Weaver does not argue that the evidence is insufficient to prove that he did contact her breast; instead, he challenges only the sufficiency of the evidence to prove the specific intent of indecency with a child. *See* Tex. Penal Code Ann. § 21.11(a)(2). "The specific intent required for the offense of indencency with a child may be inferred from a defendant's conduct, his remarks, and all of the surrounding circumstances." *McKenzie v. State*, 617 S.W.2d 211, 216 (Tex. Crim. App. 1981); *see Bazanes v. State*,

21

310 S.W.3d 32, 40 (Tex. App.—Fort Worth 2010, pet. ref'd); *Couchman v. State*, 3 S.W.3d 155, 163 (Tex. App.—Fort Worth 1999, pet. ref'd). An oral expression of intent is not required to prove this element. *See Tyler v. State*, 950 S.W.2d 787, 789 (Tex. App.—Fort Worth 1997, no pet.); *Gottlich v. State*, 822 S.W.2d 734, 741 (Tex. App.—Fort Worth 1992, pet. ref'd). A complainant's testimony alone is sufficient to support a conviction for indecency with a child. *Connell v. State*, 233 S.W.3d 460, 466 (Tex. App.—Fort Worth 2007, no pet.). "Furthermore, intent can be inferred from the appellant's conduct after the incident." *Williams v. State*, 305 S.W.3d 886, 891 (Tex. App.—Texarkana 2010, no pet.); *Couchman*, 3 S.W.3d at 163.

Here, the jury heard testimony that Weaver's sexual conduct towards Kelsey progressed gradually, from starting with massaging sore muscles, to asking her to take her shirt off so that he could massage her, to massaging her breasts over and under her clothes, and ultimately to fondling and penetrating her sexual organ. This gradual progression added each additional act into a consistent pattern that included a sudden cessation of his inappropriate touching when he was in danger of being seen by his wife. Upon being confronted by Lisa about Kelsey's disclosure to Dae that she was uncomfortable living with Weaver, Lisa described him as "quiet at first" but eventually admitting to engaging in conduct that he characterized as "massages." Weaver then moved out of the house.

Weaver's conduct alone is sufficient to infer intent. *See Corporan v. State*, 586 S.W.3d 550, 562 (Tex. App.—Austin 2019, no pet.) (holding that the jury could

22

have inferred appellant's sexual intent in touching child's genitals by manner in which he "cupped" her genital area); *Abbott v. State*, 196 S.W.3d 334, 340 (Tex. App.—Waco 2006, pet. ref'd); *Gottlich*, 822 S.W.2d at 741 (holding that testimony that appellant placed his hand in a thirteen-year-old girl's panties and "played" with her "private" was sufficient for a rational trier of fact to infer the element of intent to arouse or gratify sexual desire); *Fetterolf v. State*, 782 S.W.2d 927, 933 (Tex. App.—Houston [14th Dist.] 1989, pet. ref'd) (holding that complainant's testimony that appellant's hand had encircled her breast was sufficient evidence for a rational trier of fact to find that appellant had touched the child with the intent to arouse his sexual desire). We overrule Weaver's second issue.

### C. Count Three

In his third issue, Weaver argues that there is insufficient evidence to prove that he penetrated the sexual organ of Kelsey as alleged in count three of the indictment. After reviewing the entire record in this case and outlining the relevant evidence above, we conclude that there is sufficient evidence to support the penetration element of Weaver's sexual-assault conviction in count three.

Kelsey began her testimony concerning finger penetration with the last time that the act had occurred—the abuse alleged in count four of the indictment. She described that this last event took place in her bedroom and began, as was his routine, with Weaver massaging her shoulders. She gave details of how his massage progressed to her breasts and ultimately to the penetration of her vagina for "what felt

23

like forever." Following that testimony, she was asked about other times that Weaver had "actually penetrated her vagina." She answered that there was another time in the computer room and another in her bedroom. She was asked to describe the other act of vaginal penetration in her bedroom. She then recounted the details of the event that was alleged in count three. Following cross-examination, Kelsey confirmed that the sexual assaults alleged in count three and count four both involved "times he put his fingers in [her] vagina in [her] bedroom."

Weaver argues that the jury arrived at a "speculation-driven conclusion" that there was actual penetration proven by the testimony of Kelsey as it pertained to count three. The State argues that the jury could have drawn reasonable inferences and weighed any conflicting evidence to find that Weaver had committed the offense as alleged in count three. We agree with the State.

To evaluate the sufficiency of the evidence, we consider the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Acosta*, 429 S.W.3d at 624–25. "This standard tasks the factfinder with resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts." *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). Kelsey's testimony concerning count three was clearly directed toward her description of a second instance when Weaver had penetrated her vagina with his finger in her bedroom. Whether her testimony, in which she stated that she "believed he [had]

24

placed a finger inside" her vagina, conflicted for the jury to decide. *See Lancon v. State*, 253 S.W.3d 699, 706 (Tex. Crim. App. 2008) (noting that because resolution of conflicting testimony is within the province of the factfinder, appellate courts must defer to the jury's resolution of conflicts in the evidence). The jury resolved any conflict in Kelsey's testimony, and the verdict establishes that the jury believed her. Considering the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found beyond a reasonable doubt that Weaver penetrated Kelsey's sexual organ as alleged in count three. We overrule Weaver's third issue.

## IV.  CUMULATION OF SENTENCES

In Weaver's fourth issue, he argues that the trial court erred by cumulating the sentences that the jury assessed for the four counts of the indictment. Weaver also argues that the cumulated sentence is grossly disproportionate to that determined by the jury. Prior to trial, Weaver elected for the jury to assess punishment and filed a request for noncumulative sentences. The State filed a motion for cumulative sentences. The jury assessed punishment at imprisonment for two years for count one, eight years on count two, ten years on count three, and twenty years on count four. After the trial court accepted the verdict of the jury, the State asked the trial court to "consider the previously filed motion to stack." The trial court granted the State's motion and ordered the four sentences to run consecutively—resulting in a forty-year sentence. Weaver objected to the trial court's stacking the sentences, and the trial court "denied" that objection.

25

Generally, when a defendant is found guilty of more than one offense arising out of the same criminal episode and prosecuted in a single criminal action, the sentences shall run concurrently. Tex. Penal Code Ann. § 3.03(a). However, there are exceptions for certain offenses when such sentences may run consecutively. *Id.* § 3.03(b). Indecency with a child and sexual assault of a child are included within those exceptions. *Id.* § 3.03(b)(2)(A).

Weaver acknowledges that current Court of Criminal Appeals precedent allows the trial court "the discretionary decision whether to cumulate individual sentences." *Barrow v. State*, 207 S.W.3d 377, 381 (Tex. Crim. App. 2006). Weaver explicitly concedes that this intermediate court of appeals is "bound" by *Barrow*, which "compels an adverse ruling." Nevertheless, Weaver argues that *Barrow* was incorrectly decided. We must leave that question to the Court of Criminal Appeals. "Because a decision of the [C]ourt of [C]riminal [A]ppeals is binding precedent, we are compelled to comply with its dictates." *State v. Stevenson*, 993 S.W.2d 857, 867 (Tex. App.—Fort Worth 1999, no pet.).

Weaver also argues that the cumulated sentence of forty years doubled the jury's verdict and resulted in a sentence grossly disproportionate to that determined by the jury. Weaver seems to argue that the cumulated sentence violates the prohibition against cruel and unusual punishment found in the Eighth Amendment of the United States Constitution. U.S. Const. amend. VIII. As stated above, the punishment for counts two, three, and four ranged to a maximum of ninety-nine years or life in

26

prison. *See* Tex. Penal Code Ann. § 12.32. The act of ordering the sentences to run consecutively does not constitute cruel and unusual punishment. *Baird v. State*, 455 S.W.2d 259, 259 (Tex. Crim. App. 1970); *see Stevens v. State*, 667 S.W.2d 534, 538 (Tex. Crim. App. 1984). In *Barrow*, the Court of Criminal Appeals discussed this very issue: "The Legislature has charged the trial court with the determination of whether to cumulate, and the trial court is free to make this determination so long as the individual sentences are not elevated beyond their respective statutory maximums." 207 S.W.3d at 382. Forty years does not exceed the maximum for counts two, three, or four. We overrule Weaver's fourth issue.

## V. CONCLUSION

Having overruled each of Weaver's issues, we affirm the trial court's judgment.

/s/ Lee Gabriel

Lee Gabriel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: July 28, 2022